Filed 7/20/15  P. v. Johnson CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERICA JOHNSON,<br><br>    Defendant and Appellant. | B254407<br><br>(Los Angeles County<br>Super. Ct. No. NA093290) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Erica Johnson raises contentions of insufficient proof, improper admission of evidence, and instructional error following her conviction of premeditated attempted murder, with enhancements for personal firearm use and infliction of great bodily injury. For the reasons discussed below, the judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On December 27, 2011, Mario Carr[1] was living in Long Beach with his sister Jessica and her fiancé Terrill Coates. About 8:00 p.m. that evening, Mario left the apartment to walk the dogs. He told Coates that after walking the dogs he was going to meet defendant Johnson, whom he had known for about six months. Mario testified that, although Johnson had expressed a romantic interest in him, he thought of her only as a friend.

Mario testified Johnson had asked him to meet her at an alley near her Long Beach apartment. When Mario arrived he saw that Johnson was accompanied by a man he knew as Bam, who was Johnson's friend. Both Johnson and Bam had guns. A fight broke out between Mario and Bam. During this fight, Johnson shot Mario in the back of the head. Mario sustained significant brain injury and he was in a coma for a number of months. He suffered permanent disabilities in cognition, speech and mobility, and is now confined to a wheelchair. His language abilities are greatly diminished and his testimony consisted of a combination of halting speech and tapping out words on a message board.

Mario testified Johnson shot him "because of drugs." He also testified that he did not know what the fight with Bam was about. Johnson was standing behind Mario while he and Bam were fighting, and Mario was on top of Bam when Johnson shot him.

---

[1] For purposes of clarity, we will henceforth refer to Mario Carr and his sister, Jessica Carr, by their first names and mean no disrespect.

2

Mario testified this was not the first time he saw Johnson with a gun. She pointed a gun at him less than a month before the shooting. On that occasion, while pointing the gun at Mario, Johnson threatened him by saying "words to the effect, 'If you ever leave me[.]' "

Dr. Serina Hoover, a clinical neuropsychologist, treated Mario for several months in mid-2012. She testified the injury to the cerebellum and the right temporal lobe of Mario's brain had affected his ability to speak and coordinate his movements, as well as his visual and spatial skills. There was, however, no injury to Mario's left temporal lobe which affects memory.

Mario's mother, Lashone Haywood, testified that when she visited Mario in the hospital he informed her, by shaking his head in response to her questions, that he had been shot by a woman, not a man. Haywood then contacted Detective Patrick Lyon because she remembered Mario having told her, several weeks before the shooting, that Johnson had threatened him with a gun: "[Mario] told me that he was sitting in the car with his friend. [Johnson] came in daylight, with a gun pointed at him [and] . . . said if you ever leave me, dancing [*sic*], that's what he told me."

Mario's sister Jessica testified that after the shooting she received several texts and phone calls from Johnson, whom she did not consider a friend. Johnson told Jessica "that she didn't do it" and "that she loved Mario." Detective Donald Goodman testified Jessica told him that a few weeks before the shooting Johnson threatened to shoot Mario. Goodman testified Jessica said "that Mario went to [Johnson's] apartment . . . and [she] produced a handgun and threatened to shoot him with it. And then [Jessica] kind of toned it down. Said it could have been – I think Mario said it was kind of a joke, he really wasn't serious."[2]

When Detective Goodman interviewed Johnson, she said that she had been alone at home the entire day and night of the shooting. Around the time of the shooting, she

---

**2**     It is unclear from the record if there were two *different* prior occasions on which Johnson threatened Mario with a gun, or whether both of these stories were meant to describe the *same* event.

was taking a shower when she heard some noises that she thought were fireworks. When Goodman and his partner showed Johnson pictures of Mario, Johnson claimed that she did not know who he was. After further questioning, however, Johnson admitted knowing him. She said she lied about not recognizing Mario's photographs because she was scared of the detectives being in her apartment and she did not want to get involved. Johnson then denied that Mario had ever been inside her apartment, although she subsequently changed her story and said he had been there on two occasions. Asked if she could think of anyone who might have been with Mario or could have shot him, Johnson mentioned a woman who used methamphetamine, "some lesbians that she had seen in the alley," and a woman named Quonesha who was Mario's girlfriend or ex-girlfriend.

By mid-February, Detective Goodman had been contacted by medical personnel who advised him that Mario would likely survive his injuries and be able to communicate in the future. The investigation was transferred to Detective Patrick Lyon in March, and Goodman informed Lyon of Johnson's suspected role in the shooting. Lyon met with Mario in June 2012 to ask him about the shooting. When Lyon mentioned Johnson's name, Mario reacted very forcefully: "As soon as I mentioned if Erica Johnson shot him, he began to shake. His body began to shake. And he began to sweat profusely. He really shook his head in the affirmative, like really fast up and down. It was to the point where my partner . . . even made a comment, like, are you okay? [¶] At that point we had to stop the interview because it looked like he was so upset."

2. *Defense evidence.*

Neurologist Arthur Kowell reviewed Mario's medical records, which demonstrated Mario sustained severe brain injury in the shooting because bullet fragments had damaged his brain stem. Dr. Kowell testified there was an injury to Mario's right temporal region whose "functions . . . involve memory, particularly visual memory." This "can result in [the] patient not being able to see parts of things in the visual field," which affects "[w]hat one sees and then the abilities [*sic*] to visually remember."

4

3. *Trial outcome*.

Johnson was convicted of premeditated attempted murder, with enhancements for personal firearm use and infliction of great bodily injury. (Pen. Code, §§ 664, 187, 12022.53, 12022.7).[3] She was sentenced to state prison for a term of life, plus 25 years to life. This appeal followed.

**CONTENTIONS**

Johnson contends: (1) there was insufficient evidence to support the jury finding that the attempted murder had been premeditated and deliberate; (2) the trial court erred in admitting evidence of Johnson's prior gun threat to Mario; and (3) the trial court erred in not instructing the jury on attempted voluntary manslaughter as a lesser included offense.

**DISCUSSION**

1. *There was sufficient evidence of premeditation and deliberation.*

Johnson contends there was insufficient evidence to sustain the premeditation and deliberation element of premeditated attempted murder. There is no merit to this claim.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably

---

[3] All further statutory references are to the Penal Code unless otherwise specified.

5

be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

*People v. Anderson* (1968) 70 Cal.2d 15, 26-27, a murder case, discussed the following types of premeditation and deliberation evidence.[4] "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first

---

[4] "We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation. [Citation.]" (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."

The *Anderson* factors do not establish normative rules, but instead provide guidelines for a reviewing court's analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, the *Anderson* factors are not a sine qua non to finding deliberation and premeditation, nor are they exclusive. (*People v. Sanchez*, at p. 32; *People v. Davis* (1995) 10 Cal.4th 463, 511 [*Anderson* factors are descriptive, not normative]; *People v. Raley* (1992) 2 Cal.4th 870, 886 [when evidence of all three *Anderson* factors is not present, appellate courts look for either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing].)

b. *Discussion*.

There was evidence of planning activity because Mario testified Johnson asked him to meet her in the alley where, it turned out, she and her friend Bam were waiting with guns. Bringing a gun to the meeting demonstrated that Johnson was prepared to use deadly force. (See, e.g., *People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907 ["that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Alcala* (1984) 36 Cal.3d 604, 626, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 ["when one . . . brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].)

There was also strong motive evidence because just a few weeks earlier Johnson threatened to shoot Mario if he left her. There was also some evidence that a dispute over drugs was involved. Whether Johnson shot Mario because of a frustrated romantic interest in him or a drug deal gone bad (or some combination of the two), this evidence demonstrated Johnson had a reason for wanting to kill Mario.

7

The manner of killing also tended to show premeditation and deliberation because Mario had been shot once in the back of the head, which is consistent with a calmly-executed killing. (See *People v. Bolin* (1998) 18 Cal.4th 297, 332 ["While defendant fired some shots at Mincy as he was attempting to flee, at least one shot entered his body as he lay in a fetal position. This forensic evidence indicates defendant did not want merely to wound either victim; he wanted to make certain they died."]; *People v. Mayfield* (1997) 14 Cal.4th 668, 768, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2 ["firing of the gun at [the victim's] face is a manner of killing that was entirely consistent with a preconceived design to take his victim's life"].)

Johnson argues "the shooting *could not* have been willful, deliberate and premeditated. It was spur of the moment and only in response to aggressive actions between Mario and Bam." (Italics added.) But the fact Mario and Bam were fighting with each other at the moment Johnson pulled the trigger does not negate the fact Johnson had lured Mario to the alley where she and her friend were waiting with guns. The inference that Johnson's initial plan was to kill Mario is no more speculative than the inference Johnson shot Mario in a panic because she feared for Bam's safety. (See *People v. Rodriguez, supra,* 20 Cal.4th at p. 12 [evidence is sufficient which relies on inference that is "no more inherently speculative" than counter-inference].) Johnson's post-shooting conduct – which included denying to Detective Goodman that she even knew Mario or that he had ever been to her apartment – demonstrated inculpatory consciousness of guilt. And even if the jury found Johnson had not gone to the alley planning to kill Mario, a reasonable jury could have concluded that she made a conscious decision to do so while Mario was fighting with Bam. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [" 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]' [Citation.]"].)

Because the evidence supported an inference that Mario's shooting " 'was the result of preexisting reflection and weighing of considerations rather than mere

8

unconsidered or rash impulse,' " there was sufficient evidence of premeditation and deliberation. (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

2. *Evidence of the prior gun threat was properly admitted.*

Johnson contends the trial court improperly admitted (1) Mario's testimony regarding an earlier incident in which she threatened him with a gun and (2) evidence that, prior to the shooting in the alley, Mario had reported this gun threat to his mother and sister. We disagree.

a. *Background*.

Mario testified that, a few weeks before the shooting, Johnson threatened him with a gun and said she would kill him if he ever left her. There was no defense objection to this testimony.

The defense did object when the prosecution said it intended to elicit evidence that Mario told his mother and sister about this threat *prior to* the shooting. However, the trial court overruled this objection, pointing out that on cross-examination defense counsel questioned the reliability of Mario's testimony that it was Johnson who shot him and, therefore, that the proposed evidence fell within the hearsay exception for prior consistent statements. Thereafter, the prosecution put on evidence that – prior to the shooting in the alley – Mario told his mother and his sister that Johnson had threatened him with a gun.

On appeal, Johnson argues this evidence should not have been admitted because "[t]he prior gun incident was inadmissible propensity evidence" under Evidence Code section 1101, which "does not allow for admission of such evidence to prove a prior consistent statement." In addition, Johnson argues the evidence should not have been admitted in any event because "[t]here was no issue over whether Johnson acted intentionally or not when Mario was shot. Rather, the question was whether Johnson was . . . present when Mario was shot."

9

b. *Discussion.*

The trial court properly admitted this evidence under the hearsay exception for prior consistent statements. Evidence Code section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791, subdivision (b), provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

On cross-examination, the defense aggressively attacked the reliability of Mario's testimony. Defense counsel questioned Mario's ability to accurately recall events that occurred before the shooting, i.e., before he spent months in a coma. Defense counsel suggested Mario had been getting ideas about what happened to him from his dreams. Defense counsel complained to the jury that, due to Mario's medical condition, it had not been possible to subject his story to rigorous scrutiny.[5] Johnson put on a defense expert who testified, contrary to the prosecution's expert, that the gunshot had struck a portion of Mario's brain involved with memory. This attack on Mario's credibility, with its

---

[5] During closing argument, defense counsel complained: "See, that's the problem with Mario Carr's testimony. Everything, the answer is told to him. Everything is leading. Answers already told to him. He can only respond yes or no. It's not fair." Defense counsel also said, "Mario even says I remember these things from dreams. That's what he said. He doesn't admit that now but he admitted it in a previous courtroom when he promised to tell the truth." During cross-examination, defense counsel asked Mario if he had once said to a deputy district attorney, "Yeah, my memory [*sic*] were based from dreams." Although Mario denied it, defense counsel then read from the preliminary hearing transcript, in which Mario had answered "yes" to the question, "Is it in your dreams that you remember certain things?" and "yes" to the question "And is it . . . in your dream that you remember about this fight?"

implied charge of recent fabrication, allowed the prosecution to admit the evidence of Mario's prior statements to his mother and sister. As our Supreme Court recently held, a "broad, implicit charge of fabrication allow[s] the prosecutor to admit [a witness's] prior statements that were consistent with his . . . testimony. (*People v. Collins* (2010) 49 Cal.4th 175, 216 . . . [prior consistent statements admissible to rebut implied charge that witness's testimony was based on information in police report and coaching by others rather than on own recollection]; see *People v. Brents* (2012) 53 Cal.4th 599, 616 . . . [broad charge that witness's entire testimony was unreliable warranted admission of prior consistent statement to rehabilitate witness].)" (*People v. Kopatz* (2015) 61 Cal.4th 62, 86.)

Contrary to Johnson's argument, the evidence that Mario told his mother and sister about the gun threat prior to the shooting in the alley did not violate Evidence Code section 1101, subdivision (a), which provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion" because it was not introduced to prove Johnson's conduct on the specified occasion but to rebut the attack on Mario's credibility. (See *People v. Abel* (2012) 53 Cal.4th 891, 928 [evidence of guns found in defendant's car was properly admitted to corroborate other evidence defendant had been seen with similar weapons because Evidence Code section 1101, subdivision (c), "expressly allows" such evidence "on the issue of a witness's credibility"].)

Moreover, Mario's own testimony about the prior gun threat was admissible under Evidence Code section 1101, subdivision (b), to demonstrate Johnson's intent and motive. "Evidence of prior criminal acts is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . . ),' but not to prove the defendant carried out the charged crimes in conformity with a character trait. (Evid. Code, § 1101.)" (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637.) By pleading not guilty, Johnson placed at issue the premeditation and deliberation elements of premeditated attempted murder. "Defendant's not guilty plea put in issue all of the

11

elements of the offenses." (*People v. Steele* (2002) 27 Cal.4th 1230, 1243; see, e.g., *People v. Jones* (2011) 51 Cal.4th 346, 372 ["Defendant argues that only identity was actually disputed at trial, and he did not dispute the perpetrator's intent to rob . . . . Even if this is so, it is not dispositive. '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' "].)

Threatening Mario with a gun a few weeks before she shot him in the back of the head tends to demonstrate that Johnson had a motive to kill him (and therefore a reason to lure him to the alley), and also that Johnson's intention when she pulled the trigger had been to kill Mario rather than merely trying to stop the fight between him and Bam. "A defendant's threat against the victim . . . is relevant to prove intent in a prosecution for murder. [Citation.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757; see *People v. Cruz* (2008) 44 Cal.4th 636, 671 ["The prior threat to kill [one deputy sheriff] by shooting him in the back of the head was 'manifestly admissible to show defendant's state of mind' at the time he fatally shot [another deputy sheriff] in the back of the head."]; *People v. Goldbach* (1972) 27 Cal.App.3d 563, 570 [trial court properly admitted evidence of defendant's earlier threats against the victims because "the evidence of the threats established premeditation and deliberation, elements of the crime of first degree murder rather than a predisposition to commit the crime"].)

Hence, the trial court did not abuse its discretion under Evidence Code section 1101 by admitting Mario's testimony about Johnson's prior act of threatening him with a gun. Nor did the trial court abuse its discretion by subsequently admitting evidence that Mario had mentioned this gun threat to his sister and mother.

3. *Claim regarding failure to instruct on lesser included offenses was waived.*

Johnson contends the trial court erred by failing to instruct the jury on attempted voluntary manslaughter as a lesser included offense, despite having specifically asked the court not to give this instruction. Because any error was invited, this contention was waived. Even if the contention had not been waived, it is meritless.

12

a. *Background.*

Just before the jury was brought into the courtroom for the reading of the jury instructions, the following colloquy occurred:

"[The Court]: We have all the jury instructions we went over yesterday. One question mark is whether or not Mr. Ma, on behalf of your client, you would like to request any lesser included instructions?

"Mr. Ma: I did consider that, Your Honor, and at this point strategically I am not asking [for] the attempted voluntary manslaughter instructions.

"The Court: You agree, Miss Johnson?

"The Defendant: What does that mean?

"The Court: You want to explain to her?

"(Pause.)

"The Defendant: Yes.

"The Court: Did you speak to your attorney about the lesser included instructions that could be instructed by the court?

"The Defendant: Yes.

"The Court: Do you agree to that?

"The Defendant: Yes."

b. *This claim is waived under the invited error doctrine.*

"The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 827.) "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense. [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

However, "[d]espite the circumstance that it is the *court* that is vested with authority to determine whether to instruct on a lesser included offense, the doctrine of invited error still applies if the court accedes to a defense attorney's tactical decision to request that lesser included offense instructions not be given. Such a tactical request

13

presents a bar to consideration of the issue on appeal. [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1265; see also *People v. Cooper*, *supra*, 53 Cal.3d at p. 827 [error is invited if conscious tactical choice was made].)

"[T]he record must show only that counsel made a conscious, deliberate tactical choice between having the instruction and not having it. If counsel was ignorant of the choice, or mistakenly believed the court was not giving it to counsel, invited error will not be found. If, however, the record shows this conscious choice, it need not additionally show counsel correctly understood all the legal implications of the tactical choice. Error is invited if counsel made a conscious tactical choice. A claim that the tactical choice was uninformed or otherwise incompetent must, like any such claim, be treated as one of ineffective assistance of counsel." (*People v. Cooper*, *supra*, 53 Cal.3d at p. 831.)

Here, the record demonstrates that defense counsel made a conscious and deliberate tactical choice not to have the trial court give an attempted voluntary manslaughter instruction as a lesser included offense. Defense counsel told the trial court that as a matter of strategy he did not want the jury instructed on voluntary manslaughter. At the trial court's direction, defense counsel conferred with Johnson in an off-the-record discussion, apparently explained the issue to her, and Johnson then said she agreed with this strategy. The defense, as manifested by defense counsel's closing argument to the jury, was that Johnson did not shoot Mario, that she was not even in the alley that night, and that she had committed no crime.[6] This is the classic situation in which a defendant asks that lesser included offense instructions not be given in order to force the jury to make an "all-or-nothing" decision.[7]

---

[6] During defense closing argument: "Of course there was an attempted murder. [¶] But that's not the question. The question is did the People prove this case beyond a reasonable doubt. Give you enough evidence that Miss Johnson did this."

[7] See, e.g., *People v. Matian* (1995) 35 Cal.App.4th 480, 484: "At trial, defense counsel expressly, on the record, and with appellant's concurrence, objected, for tactical reasons, to any instructions on lesser offenses to the felony false imprisonment charge.

14

Because the record demonstrates that any error by the trial court in failing to instruct on attempted voluntary manslaughter was invited by the defense, Johnson has waived the issue on appeal.

c. *A jury instruction on attempted voluntary manslaughter was unwarranted*.

Even if Johnson did not waive this issue by virtue of the invited error doctrine, we would conclude the trial court did not err by failing to instruct the jury on attempted voluntary manslaughter based on either an imperfect self-defense theory or a heat-of-passion theory.

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) If the jury rejected Johnson's alibi defense, the only evidence regarding what happened in the alley came from Mario, who testified that, while he was fighting with Bam, Johnson shot him in the back of the head. Hence, there was no direct evidence that Johnson actually believed either she or Bam was in imminent danger. Although circumstantial evidence can prove a defendant's state of mind, Johnson merely points to the fact that Bam and Mario "began to violently exchange punches." Johnson's implicit assertion that any unarmed fist fight must give rise to an actual belief in the need for lethal self-defense is unsupported by any pertinent authority or reasoned argument. The fact Mario and Bam were fighting, without more, did not provide substantial evidence that Johnson believed she or Bam was in imminent peril.

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter [citation], if the killer's reason was

The trial court did not instruct on misdemeanor false imprisonment. Thus, the jury was given the classic 'all or nothing' choice of acquittal or conviction of the greater charge."

15

actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) There was no evidence that, when she shot Mario, Johnson's reason had been clouded by a passionate emotion. Nor was there any evidence Mario had engaged in sufficiently provocative conduct to warrant the instruction. "The test of adequate provocation is an objective one . . . . The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 60.) "[P]redictable conduct by a resisting victim would [not] constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*People v. Jackson* (1980) 28 Cal.3d 264, 306, disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) Mario testified that, before Johnson shot him, Bam was trying to draw his gun and Mario was trying to prevent him from doing so.

The trial court did not err by failing to instruct the jury on attempted voluntary manslaughter.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.